845 P.2d 770

**ELECTRO–JET TOOL AND MANUFAC-
TURING COMPANY, INC., an Ohio
corporation, Plaintiff–Appellant,**

v.

**The CITY OF ALBUQUERQUE,
a municipal corporation,
Defendant–Appellee.**

**No. 19749.**

Supreme Court of New Mexico.

Sept. 8, 1992.

Oman, Gentry, Yntema & Stotts, Nicholas R. Gentry and Todd W. Rogers, Albuquerque, for plaintiff-appellant.

David S. Campbell, City Atty. and David Suffling, Asst. City Atty., Albuquerque, for defendant-appellee.

## OPINION

MONTGOMERY, Justice.

Article II, Section 20, of the New Mexico Constitution provides: "Private property shall not be taken or damaged for public use without just compensation." In this case we consider the meaning of the phrase "for public use" in the context of an inverse condemnation claim for damage to a property owner's buildings caused by a municipality's maintenance of nearby drainage ditches.

### I.

The plaintiff is Electro–Jet Tool and Manufacturing Company, Inc. ("Electro–Jet"). It owns one or more buildings and other facilities on the north side of Albuquerque, New Mexico, not far from the Rio Grande River. Two drainage ditches, originally constructed and thereafter maintained by the City of Albuquerque ("the City"), border Electro–Jet's property. One ditch is located on the south side of the property and the other on the west. The purpose of the ditches is to carry away storm and other waste water and otherwise to drain the abutting property. The south side ditch empties into the west side ditch, and water drained through both ditches eventually empties into the river.

In the summer of 1986, the City performed alteration and maintenance work on both ditches. With respect to the west side ditch, it altered the slope of the ditch so that water ponded to a depth of several inches on several occasions, some of which lasted for several days. The west side ditch work also dammed up the south side ditch, so that water ponded in the latter ditch as well. The City also failed to maintain the grade of the south side ditch and to clean it out properly; these failures also caused water to pond in that ditch. The ponding water migrated through the subsurface soil and caused Electro–Jet's buildings to settle and otherwise damaged its property.

Electro–Jet brought suit for this damage against the City and various other defendants in July 1988. Two claims were asserted against the City: a claim for negligence and a claim in inverse condemnation. The City answered, admitting and denying various allegations in the complaint and raising various defenses, including defenses that the complaint failed to state a claim upon which relief could be granted and that the City was immune under the Tort Claims Act from liability for any of the alleged acts of negligence. Extensive discovery followed, and in October 1990 the City moved for summary judgment as to Electro–Jet's inverse condemnation claim. The sole ground for the City's motion was that, under the allegations in the complaint and in light of Electro–Jet's answers to the City's interrogatories, Electro–Jet had not stated a claim in inverse condemnation. The trial court agreed and, by order entered in January 1991, granted summary judgment to the City on Electro–Jet's claim for inverse condemnation, dismissed with prejudice the count in the complaint asserting the claim, and certified the order as a final judgment under SCRA 1986, 1–054(C)(1) (order adjudicating fewer than all claims and determining absence of just reason for delay is final judgment). Electro–Jet thereupon appealed.[1]

1. The court first announced its ruling on the City's motion for summary judgment by a letter decision in November 1990. Electro–Jet then filed a motion for reconsideration, attaching excerpts from several depositions taken during discovery. These excerpts raised the possibility that the maintenance or alteration work in the west side ditch in 1986 was related to construc-

The trial court's order granting the City summary judgment on Electro–Jet's inverse condemnation claim did not recite the basis for the order, except to say that there was no genuine issue as to any material fact and that the City was entitled to judgment on the claim as a matter of law. From the parties' briefs and arguments, however, we think it probable that the court based its ruling on the propositions that a claim for inverse condemnation and a claim for negligence are mutually exclusive and that Electro–Jet, by predicating its inverse condemnation claim on the same facts as its negligence claim, was barred as a matter of law from seeking inverse condemnation. In its answers to the City's interrogatories, Electro–Jet had stated that the facts underlying its inverse condemnation claim were essentially the same as those constituting the City's allegedly negligent alteration and maintenance. Additionally, in answer to an interrogatory requesting that it describe specifically what alteration or maintenance was performed by the City that resulted in damage to its property, Electro–Jet had said that the same actions as described in another answer describing the allegedly negligent alteration or maintenance also applied to its inverse condemnation claim. And finally, in response to the question, "Do you claim that the design or maintenance or alteration of the south and west ditches were reasonably expected to cause damage or taking of [Electro–Jet's] property if done in a reasonabl[y] prudent manner?," Electro–Jet had answered: "No. If maintenance had been performed in a reasonably prudent and non-negligent manner, the damages sustained by Electro–Jet would not have occurred."

Electro–Jet argues on appeal that the position evidently adopted by the trial court, and which it ascribes also to the City, has no support in New Mexico law.

It maintains that the inverse condemnation count of its complaint alleged all of the elements necessary to support a claim in inverse condemnation and that the presence or absence of negligence as part of the facts underlying such a claim is immaterial to a property owner's entitlement to inverse condemnation when those elements are alleged and proven. It further maintains that the only elements of a properly asserted inverse condemnation claim are: (1) a taking or damaging of private property for public use, by (2) an entity authorized to exercise the power of eminent domain, where (3) there has been no compensation paid nor condemnation initiated. (It will be noted that this phrasing of the "elements" of an inverse condemnation claim begs the question considered in this opinion, since it recognizes that the taking or damaging must be "for public use.") Electro–Jet completes its argument by insisting that all three of these elements were alleged in its complaint, and indeed were admitted by the City in moving for summary judgment, and that it was therefore entitled to pursue its claim for inverse condemnation.

In connection with this last part of its argument, Electro–Jet has affirmed, several times in its briefs and again at oral argument, that there are no factual issues related to its entitlement to inverse condemnation; the question posed by the trial court's order is one of law. That question is whether Electro–Jet's complaint, considered in the light of its answers to the City's interrogatories, stated a claim upon which relief through inverse condemnation could be granted.

As the trial court's order comes to us for review, therefore, it stands essentially in the same posture as an order granting a motion to dismiss for failure to state a claim under SCRA 1986, 1–012(B)(6). Un-

tion activity in that ditch in 1988, when the City paved or lined the ditch with concrete. The court in effect denied this motion when, two months later, it granted the City's motion for summary judgment. On appeal, the parties have mentioned Electro–Jet's motion for reconsideration and the accompanying deposition excerpts; but Electro–Jet has made it clear, in its

briefs and at oral argument, that its claim for inverse condemnation is based on the work done in 1986 and is not dependent on anything done by the City in 1988. In any event, as stated in footnote 4 below, we deem any distinction between "construction" and "maintenance" irrelevant in determining whether property has been taken or damaged for public use.

der the latter part of that rule, when a defendant's motion to dismiss relies on matters outside the complaint itself, it is to be treated as a motion for summary judgment. The City's motion relied on Electro–Jet's answers to its interrogatories, and the trial court in granting summary judgment and dismissing Electro–Jet's inverse condemnation claim presumably considered those answers. That does not change the fact that the City's motion essentially sought, and the court's order granted, dismissal of the count for failure to state a claim upon which relief could be granted.

■ In deciding this appeal, we agree with Electro–Jet's assertion that negligence is irrelevant to a viable claim for inverse condemnation, but we disagree with its position that the only allegation required to state an inverse condemnation claim is that damage to private property has resulted from a public entity's performance of a public purpose. Electro–Jet's emphasis is on the transitory act or omission of government in pursuit of a public purpose, not on the damage to property for public use. The Constitution speaks not to the act, but to the property. The damage must be the result of the public entity's deliberate taking or damaging of the property in order to accomplish the public purpose. This is the meaning we ascribe to the constitutional phrase "for public use."[2] In the remainder of this opinion we shall elaborate on the ways in which such deliberate action by the public entity[3] may be alleged to state a claim for inverse condemnation.

■ Electro–Jet's count in inverse condemnation did not allege any action by the City amounting to a deliberate (as we shall define that term in this opinion) damaging of its property by the City, and so we conclude that the trial court correctly dismissed that count. However, it is well settled that a complaint should be dismissed for failure to state a claim only when it appears that the plaintiff could not recover under any state of facts provable under the claim. *E.g., Petty v. Bank of New Mexico Holding Co.,* 109 N.M. 524, 526, 787 P.2d 443, 445 (1990). As we discuss below, various states of fact are possible under which Electro–Jet could recover through its inverse condemnation count. We are therefore unwilling to sustain the court's dismissal of that count with prejudice; rather, we think that Electro–Jet should be given an opportunity to allege and prove facts, of the sort discussed below, that would entitle it to compensation by way of inverse condemnation. Accordingly, we vacate the trial court's order and remand with instructions to permit Electro–Jet to amend its complaint to allege facts sufficient, under the principles outlined below, to assert a claim for inverse condemnation.

II.

■ We begin by referring to an issue that is *not* involved in this appeal: the question whether a particular taking or damaging is for a "public use," in the sense of "use by the public" versus "advantage to the public." This issue frequently arises in cases where a condemnor takes or damages private property, and the question is whether the taking or damaging is for a "public use," in a narrow sense ("use by the public") or in a broader sense ("public advantage"). *Compare Threlkeld v. Third Judicial Dist. Court,* 36 N.M. 350, 15 P.2d 671 (1932) (right of way for logging company's railroad is not a public use) *and Gallup-American Coal Co. v. Gallup Southwestern Coal Co.,* 39 N.M. 344, 47 P.2d 414 (1935) (right of way for coal mining company is not a public use) *with Kaiser Steel Corp. v. W.S. Ranch Co.,* 81 N.M. 414, 467 P.2d 986 (1970) (right of way for distribution of water is a public use); *see generally* 2A Julius L. Sackman & Patrick J. Rohan, *Nichols' The Law of Eminent Domain* §§ 7.02–7.07 (Rev.3d ed. 1990) [hereinafter

---

**2.** The phrase "for public use" also appears in our statute providing for an inverse condemnation action. NMSA 1978, § 42A–1–29(A) (Cum. Supp.1991). Electro-Jet invoked this statute in its complaint.

**3.** By "public entity" in this context we mean an entity having the power of eminent domain.

*Nichols* ] (discussing broad and narrow views and analyzing concept of "public use").

As just mentioned, there is no issue on this appeal as to the meaning of the phrase "public use"; the City did not below and does not here controvert Electro–Jet's declaration, in its answers to the City's interrogatories, that the maintenance and improvement of the ditches was undertaken to channel and control run-off and waste water for the benefit of the public and was for a public use. Rather, the issue on this appeal focuses on the preposition "for" in the phrase "for public use" and seeks to answer the question: When property is damaged in the course of performing an admittedly public purpose, to what extent (if any) must the damaging itself be the object of the condemnor's exercise of its power of eminent domain? In other words, to what extent (if at all) is "taken or damaged for a public use" synonymous with "taken or damaged in order to accomplish a public use"?

As noted above, Electro–Jet disputes any equivalence between the phrase "for a public use" and "in order to accomplish a public use." All that is required, according to Electro–Jet, is that an entity with the power of eminent domain be engaged in performing a public purpose, that the plaintiff's property be damaged as a result of this activity, and that the plaintiff not have received compensation nor have been subjected to a condemnation action brought by the entity. When these facts are present, Electro–Jet argues, even if the plaintiff's damage has resulted from the entity's negligence in carrying out the activity, the plaintiff is entitled to maintain an action in inverse condemnation.

Framing its argument in this way, Electro–Jet runs headlong into a widely accepted body of case law, summarized in the following statement in *Nichols:*

> If the damage for which recovery is sought is the result of improper, unlawful or negligent construction or maintenance, recovery may not be had therefor in the [condemnation] proceeding. The

owner is relegated in such case to a common-law action for damages.     .

4A *Nichols, supra,* § 14.16[1], at 14–372–76 (footnotes omitted).

This passage in *Nichols* was quoted in *Chavez v. City of Laramie,* 389 P.2d 23, 25 (Wyo.1964), in which the Wyoming Supreme Court held that the damage to the plaintiffs' property resulting from water flowing into their basement apartment from a severed water main and a crushed sewer line was not compensable under a constitutional provision virtually the same as our Article II, Section 20. The damage to the water main and sewer line had resulted from a contractor's work in connection with relocation of a highway. The court said:

> It certainly will not be contended that every destruction of property or injury thereto by public officers or their agents, in the discharge of governmental functions, is covered by the constitutional guaranty relied upon in this case. Where the injury involves a tort, being caused by the negligence of public officers or their agents, it cannot be said that property is taken or damaged for public use.

*Id.* at 25. And earlier in the opinion: "Certainly the accident and consequent damage served no public purpose, and there was absent a taking or damaging of property *for public use." Id.* at 24 (emphasis in original).

The court in *Chavez* placed considerable reliance on a leading case from Louisiana, *Angelle v. State,* 212 La. 1069, 34 So.2d 321, 2 A.L.R.2d 666 (1948), in which the court reversed a judgment for owners whose property was destroyed after a state agency sprayed their harvested sweet potatoes with a disinfecting agent, which apparently caught fire. With reference to a constitutional provision like Article II, Section 20, the court said:

> We think that the statement ["except for public purposes"] refers exclusively to the power of eminent domain, i.e., the *intentional* or *purposeful* expropriation or appropriation of private property for a public use or convenience.  * * *  The

loss for which compensation is sought resulted exclusively from a fortuitous event—a fire—as far removed from a deliberate appropriation under eminent domain as anything could be; forsooth, a wholly unintentional destruction which served no public purpose whatever.

Counsel for plaintiffs argue that, since the [state agency] was engaged in a systematic program for the eradication of sweet potato weevils, all acts of state agents in connection with the program were for a public purpose and that, therefore, it follows that any destruction of private property, though unintentional or unnecessary, is a taking of the property for a public purpose.

This argument is not sound because it fails to reckon a distinction between the destruction and damaging of private property by agents of the State while engaged merely in the performance of a governmental function and the *deliberate* taking or *necessary* damaging of property for the public use and benefit.

. . . .

. . . [T]o permit plaintiffs' theory to prevail would subject the State to an action for damages in all cases involving injury or destruction of private property resulting from the torts of its agents when acting in an official capacity. . . . [W]e cannot perceive how the unintentional destruction of the station and the other property of plaintiffs by the fire was for a public purpose; the mere fact that the fire occurred whilst the agents were engaged in performing a public duty was an incident wholly disconnected with the object of the [state agency's] program.

*Id.* 34 So.2d at 323, 327, 2 A.L.R.2d at 670–71, 674 (emphasis added).

California courts have similarly distinguished between a deliberate taking or damaging and damage resulting from tortious conduct:

The most recent cases have made a distinction between negligence which occurs when a public agency is carrying out a *deliberate plan* with regard to the construction of public works, and negligence resulting in damage growing out of the operation and maintenance of public works. . . . It has been definitely held that a property owner may not recover in an inverse condemnation proceeding for damages caused by acts of carelessness or neglect on the part of a public agency.

*Hayashi v. Alameda County Flood Control & Water Conservation Dist.*, 167 Cal. App.2d 584, 334 P.2d 1048, 1053 (1959) (emphasis added) (citing *Neff v. Imperial Irrigation Dist.*, 142 Cal.App.2d 755, 299 P.2d 359 (1956)).

The court [in *Bauer v. County of Ventura*, 45 Cal.2d 276, 289 P.2d 1, 7 (1955) (in bank)] said that the raising of the ditch bank appeared to be a *deliberate act* carrying with it the purpose of fulfilling one or another of the public objects of the project as a whole and that the damage to plaintiff's property resulted not from immediate carelessness but from a failure to appreciate the *probability* that, functioning as *deliberately conceived,* the public improvement as altered and maintained did result in some damage to private property.

*Neff,* 299 P.2d at 360–61 (emphasis added).

The cases cited thus far in this opinion are but a few of the countless decisions dealing with an almost infinite variety of fact situations and enunciating myriad rules governing instances in which compensation for an unintentional damaging of private property will be afforded as a matter of constitutional right and instances in which such damage has occurred as a result of, at most, simple negligence on the part of governmental agents carrying out public purposes. *See generally* A.W. Gans, Annotation, *Damage to Private Property Caused by Negligence of Governmental Agents as "Taking," "Damage," or "Use" for Public Purposes, in Constitutional Sense,* 2 A.L.R.2d 677 (1948); Arvo Van Alstyne, *Inverse Condemnation: Unintended Physical Damage,* 20 Hastings L.J. 431 (1969). In the welter of these cases, many of which reach results and rely on principles that are difficult to reconcile or downright inconsistent with the results and principles in other

cases, various words and concepts are used to denote situations in which the constitutional right to compensation will arise and to distinguish those situations from the many in which it will not—for example, "intentional" vs. "unintentional," "unavoidable" vs. "accidental," "necessary" vs. "fortuitous," "deliberate" or "purposeful" vs. "unintentional" or "accidental." We are reluctant to add our own set of adjectives to this list of those and others that the courts have used to express their ideas, but it is difficult to communicate in English (or any other) language without making use of the verbal symbols that evince the often slippery and elusive concepts that permeate this area of the law.

Some of the cases seem to stand for the simple proposition advocated by Electro–Jet on this appeal: All that is required is damage proximately resulting from an act of a public entity performing a public purpose, regardless of whether negligence has played any part in causing the damage. *See, e.g., Aetna Life & Casualty Co. v. City of Los Angeles,* 170 Cal.App.3d 865, 216 Cal.Rptr. 831, 835 (1985) ("*[A]ny* actual physical injury to real property proximately caused by a public improvement as deliberately designed and constructed is compensable under [the constitution,] whether or not the injury was foreseeable." (citing *Albers v. County of Los Angeles,* 62 Cal.2d 250, 42 Cal.Rptr. 89, 398 P.2d 129 (1965) (in bank), and *McMahan's of Santa Monica v. City of Santa Monica,* 146 Cal.App.3d 683, 194 Cal.Rptr. 582 (1983))). Cases like these probably rest to some extent on the once generally accepted but now widely repudiated doctrine of sovereign immunity, under which the government could not be sued without its consent—a consent sometimes found in the "just compensation" clause of a state's constitution. *See* Van Alstyne, *supra,* at 440–41:

> The initial use of private legal concepts as a framework for resolving inverse condemnation claims was a reflection, in part, of the judicial expansion of inverse condemnation as a means for avoiding the discredited doctrine of sovereign tort

immunity. ... [T]he constitutional inverse condemnation clause came to be thought of as merely a waiver of governmental immunity, and an authorization for a self-executing remedy which the injured property owner would not otherwise have had against the state and its agencies.

In New Mexico, the doctrine of sovereign immunity was abolished in *Hicks v. State,* 88 N.M. 588, 544 P.2d 1153 (1975). In response, our state legislature enacted the Tort Claims Act, NMSA 1978, §§ 41–4–1 to –27 (Repl.Pamp.1989). Section 41–4–4 grants a governmental entity and any public employee acting within the scope of duty immunity from liability for any tort except as waived elsewhere in the Act. Section 41–4–2 explains:

> A. ... [T]he area within which the government has the power to act for the public good is almost without limit, and therefore government should not have the duty to do everything that might be done. Consequently, it is declared to be the public policy of New Mexico that governmental entities and public employees shall only be liable within the limitations of the Tort Claims Act and in accordance with the principles established in that act.

> B. ... Liability for acts or omissions under the Tort Claims Act shall be based upon the traditional tort concepts of duty and the reasonably prudent person's standard of care in the performance of that duty.

From this declaration and from the authorities cited and quoted previously in this opinion, we conclude that we must reject Electro–Jet's proffered equivalence between the constitutional concept of damage "for public use" and the concept of damage resulting from performance by a governmental entity of a public purpose in carrying out a public project, whether that project be construction of a public improvement or maintenance of a public building or other structure, such as a highway or (as in this case) a drainage ditch.[4]

4. In this connection, we agree with Electro–Jet    that there is no material distinction between

Clearly, legislation such as the Tort Claims Act cannot override a constitutional guarantee like that contained in Article II, Section 20. Nevertheless, it would make no sense to hold, as a multitude of cases throughout the country have held, that a tort such as simple negligence will not give rise to a constitutional claim for compensation, and at the same time to hold that absent negligence any property damage caused by governmental conduct for a public purpose will occasion liability in inverse condemnation. We have already stated our agreement with Electro–Jet's proposition that negligence in assessing a constitutional claim under the "just compensation" clause for property damage is irrelevant, but from this we think it does not follow that something *less* than negligence will suffice; rather, we believe that a property owner must allege and prove conduct on the part of the governmental actor *more* serious—in terms of culpability, or in terms of the probability of harm to an owner's property—than mere negligence. "Negligence" is defined by our Uniform Jury Instructions as an act "which a reasonably prudent person would foresee as involving an unreasonable risk of injury ... and which such a person, in the exercise of ordinary care, would not do." SCRA 1986, 13–1601 (Repl.Pamp.1991). For an act to give rise to a claim for compensation under Article II, Section 20, we think that the act must at least be one in which the risk of damage to the owner's property is actually foreseen by the governmental actor, or in which it is so obvious that its incurrence amounts to the deliberate infliction of harm for the purpose of carrying out the governmental project.

▮ Intentionally causing the damage would clearly fall within this standard; so also would acting with knowledge that the damage was substantially certain to result

from the conduct. *See Robinson v. City of Ashdown*, 301 Ark. 226, 783 S.W.2d 53, 56 (1990) ("[W]hen one knows that an invasion of another's interest in the use and enjoyment of land is substantially certain to result from one's conduct, the invasion is intentional." (citing *Restatement (Second) of Torts* § 825(b) cmt. d (1977))). Knowledge to a substantial certainty is not required; knowledge of a substantial probability would also give rise to the requisite deliberate taking of a calculated risk. *See* Van Alstyne, *supra*, at 439 (infliction of damage by deliberate adoption of a defective plan with knowledge that damage is a probable result constitutes a form of intentional adoption of a risk-prone plan of public improvement). In all of these situations the property owner's right to compensation under the constitutional provision at issue is perhaps best summed up in a California case: "The fundamental justification for inverse condemnation liability is that the public entity, acting in furtherance of public objectives, is taking a calculated risk that damage to private property may occur." *Yox v. City of Whittier*, 182 Cal. App.3d 347, 227 Cal.Rptr. 311, 316 (1986). *See also* Van Alstyne, *supra*, at 491 (inverse liability may result "[w]hen the government, acting in furtherance of public objectives, has [deliberately or knowingly] taken a calculated risk that private property might be damaged ...").

### III.

With these principles in mind, we can now discuss the New Mexico cases relied on by Electro–Jet. It purports to find its virtually automatic rule of constitutional entitlement to compensation for its property damage in five cases: *Garver v. Public Serv. Co.*, 77 N.M. 262, 421 P.2d 788 (1966); *Wheeler v. Board of County Comm'rs*, 74

governmental activity which can be characterized as construction and activity characterized as only maintenance. *See, e.g., Wheeler v. Board of County Comm'rs*, 74 N.M. 165, 170, 391 P.2d 664, 668 (1964) ("[W]here private property has been damaged through the methods followed or adopted in the design, construction *or* maintenance of a public highway, it constitutes damage for a public use ..." (emphasis added));

*Nichols, supra*, § 6.31[2], at 6–218 to 19 ("[I]t is immaterial whether such damage occurs by reason of the construction or the maintenance of the project, so long as it is directly attributable to such causative factor and irrespective of whether or not there has been an actual physical taking of any part of such property." (footnotes omitted)).

N.M. 165, 391 P.2d 664 (1964); *Board of County Comm'rs v. Harris*, 69 N.M. 315, 366 P.2d 710 (1961); *North v. Public Serv. Co.*, 101 N.M. 222, 680 P.2d 603 (Ct.App. 1983), *cert. quashed*, 101 N.M. 11, 677 P.2d 624 (1984); and *McClure v. Town of Mesilla*, 93 N.M. 447, 601 P.2d 80 (Ct.App.1979). We think that none of these cases stands for the rule proposed by Electro–Jet.

*Garver* simply recognizes the remedy of inverse condemnation where property has been taken or damaged for public use "and the person or agency taking or damaging the same for such purpose has failed for some reason to proceed by condemnation proceedings to exercise the power of eminent domain. ..." 77 N.M. at 270, 421 P.2d at 793. In *Wheeler*, a pre-*Hicks* case that dismissed a count in negligence on sovereign immunity grounds but upheld a count in inverse condemnation, the Court declared that damages resulting from the defective design, construction, and maintenance of a highway were compensable under the "just compensation" clause of the Constitution. 74 N.M. at 170, 391 P.2d at 668. It was alleged that the damage resulted from improper drainage of water owing to the defective design, construction, and subsequent maintenance of the highway in its new alignment. *Id.* at 166, 391 P.2d at 665. The case thus easily falls under the standard noted above that permits inverse condemnation liability where a public entity deliberately constructs or maintains an improvement with knowledge of a substantial probability of damage, or at least deliberately takes a calculated risk that such damage may result.

In *Harris*, we considered a case (which does not appear to have been an inverse condemnation case) in which highway improvements had lowered the grade of the street adjacent to the property owner's property, resulting in inconvenience in getting from the street to the property and vice versa. We held that the owner was entitled to damages suffered through depreciation in the value of his property resulting from this change in grade. 69 N.M. at 317, 366 P.2d at 712. Again, this was a clear case of obviousness, to the point of substantial certainty, that the market value

of the abutting property would be damaged as a result of the condemnor's actions.

We see nothing in *North* that militates against any of the principles set forth in this opinion or that supports Electro–Jet's argument. The Court of Appeals did say, unremarkably, that "[i]f the condemning authority has taken or damaged property for public use without making just compensation therefor or without initiating proceedings to do so, the property owner has recourse through inverse condemnation proceedings." 101 N.M. at 226, 680 P.2d at 607. This appears to contemplate one of the situations described above—namely, the situation in which the condemnor knows that damage will result but fails to initiate a condemnation proceeding.

*McClure* is the case on which Electro–Jet relies most heavily. There, the Town of Mesilla, in installing a drainpipe beneath an intersection, failed to connect it to a sewer or other part of the drainage system and the pipe ended abruptly under the intersection. Rainwater emptied into the soil under the intersection and the plaintiff's nearby premises, resulting in damage to the plaintiff's property. The plaintiff sued the Town for negligence, and our Court of Appeals sustained the trial court's dismissal of the plaintiff's complaint on the ground that the Town was immune from liability under the Tort Claims Act. The Court, in an opinion by Judge Sutin, went on to hold, however, that on remand the plaintiff should be allowed to file an amended complaint to state a claim for inverse condemnation, saying: "The Constitution gives to a person, whose property is damaged for public use, the right to compensation. ... [I]nverse condemnation is not a common law tort action, and the Tort Claims Act is not an exclusive remedy." 93 N.M. at 448, 601 P.2d at 81.

We do not discern in *McClure* a holding that whenever a public entity damages private property in the course of carrying out a public project, the property owner is automatically entitled to compensation from the government. The property owner may be entitled to compensation if the government's conduct has been negligent and if

the Tort Claims Act waives immunity from liability for such negligence.[5] If the property owner rests his or her claim for compensation on the "just compensation" clause in our Constitution, the owner must allege and prove at least the kind of deliberate taking of a calculated risk described above, so that the damage can meaningfully be said to have occurred "for" (*i.e.*, in order to accomplish) a public use. The facts in *McClure* are easily embraced within this concept: It would certainly be open to the plaintiff to prove on remand that the Town intentionally caused damage to her property by leaving the drainpipe beneath the intersection unconnected to the remainder of the drainage system, or that the Town knew that damage was certain or at least probable to result, or that the Town deliberately took a calculated risk that the damage would ensue. (We note that the complaint alleged that the Town permitted the drainage line to end abruptly "with full awareness of the damage that would be done to the plaintiff's premises." *Id.* at 449, 601 P.2d at 82 (Hernandez, J., dissenting on ground that complaint was sufficient to afford relief through inverse condemnation)). Thus, nothing in *McClure* undercuts the rationale we adopt in this opinion.

### IV.

■ *McClure* does, however, point the way to our disposition of the case at bar. Here the trial court did not sustain a motion to dismiss the negligence count in Electro–Jet's complaint, but it did dismiss *with prejudice* the inverse condemnation count. As in *McClure*, we believe that the plaintiff should be given an opportunity to plead and prove facts sufficient to sustain an inverse condemnation award. Electro–Jet's complaint, insofar as it attempted to assert a claim in inverse condemnation, did little more than recite those words and the words "damage," "public use," and "eminent domain" and invoke the inverse condemnation statute, Section 42A–1–29.

While "[u]nder our rules of 'notice pleading,' it is sufficient that defendants be given only a fair idea of the nature of the claim asserted against them sufficient to apprise them of the general basis of the claim," *Petty v. Bank of New Mexico Holding Co.*, 109 N.M. 524, 526, 787 P.2d 443, 445 (1990), we believe that *some* allegation of the factual predicate for Electro–Jet's inverse condemnation claim should have been provided in the complaint. It was not, and the trial court correctly rejected Electro–Jet's claim that the mere carrying out of a public project during the course of which damage occurred to Electro–Jet's property *ipso facto* entitled the company to compensation. Dismissal of Electro–Jet's claim was therefore appropriate, but we think the plaintiff should have been given, or should be given now, an opportunity to amend its complaint to state such a factual predicate.

At oral argument, the City conceded that if it had decided to maintain the ditches in the way it did with knowledge that underground seepage was likely to damage Electro–Jet's building and had proceeded regardless of that known likelihood, an inverse condemnation claim would lie. With or without this concession, it is certainly conceivable, as a possible set of facts provable under Electro–Jet's inverse condemnation claim, that the City might have known of the nature of the soil beneath Electro–Jet's building and that it proceeded to permit water to pond in the drainage ditches regardless of that knowledge and regardless of the probability that damage to the building would ensue. Other factual scenarios are possible; we simply are unwilling at this juncture, in light of the principles announced for the first time in this opinion, to sustain dismissal of Electro–Jet's inverse condemnation claim with prejudice on the basis that it did not plead the claim with sufficient particularity.

The situation here closely parallels that in a California case, *Sutfin v. State*, 261 Cal.App.2d 50, 67 Cal.Rptr. 665 (1968). There, the trial court sustained a demurrer

---

**5.** No issue of the City's immunity or potential liability for negligence is presented on this appeal, and we intimate no conclusion as to how that issue should be resolved when it comes before the trial court.

to the plaintiff's complaint, ruling that it failed to state a cause of action in inverse condemnation. The complaint alleged that the state had planned, designed, constructed, maintained, and operated highway and related flood control works and that as a result waters from a creek had flowed onto plaintiffs' property and damaged certain property located thereon. The California appellate court held that the demurrer had been properly sustained but that leave should have been granted to plaintiffs to amend to state a proper cause of action in inverse condemnation. *Id.* at 67 Cal.Rptr. at 669. The court explained:

> We cannot ascertain from the pleading whether this physical damage allegedly caused by the government activity was *deliberately calculated* (release of water under emergency conditions), faulty planning, design or construction, a product of negligence (employee or otherwise), or the result of other circumstances not pleaded.

*Id.* (emphasis added).

Just as the court in *Sutfin* did not know whether the plaintiffs there could state facts constituting a cause of action in inverse condemnation, *id.*, we likewise do not know whether Electro–Jet can allege such facts in the instant case. But it should be given the opportunity to do so.

The judgment is accordingly vacated, and the cause is remanded for further proceedings consistent with this opinion.

IT IS SO ORDERED.

RANSOM and BACA, JJ., concur.